1

2

3

4

5                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
6                                   AT SEATTLE

7   MICHAEL T. DODGE,

8                              Plaintiff,            CASE NO. C14-0215-RSL-MAT

9          v.
                                                    REPORT AND RECOMMENDATION
10  KING COUNTY JAIL, et al.,

11                             Defendants.

12

13              INTRODUCTION AND SUMMARY CONCLUSION

14          Plaintiff Michael Dodge is a Washington State inmate who is currently confined at the

15  Monroe Correctional Complex.  He brings this action under 42 U.S.C. § 1983 seeking damages

16  for alleged violations of his federal constitutional rights which occurred during the course of his

17  incarceration at the King County Regional Justice Center ("RJC") in 2011.  Plaintiff names as

18  defendants in his second amended complaint the King County Jail, Nurse Emery, Corrections

19  Officer Harvey and Nurse David.  Defendants now move for summary judgment.  Plaintiff filed

20  a response in opposition to defendants' motion.[1]  The Court, having reviewed plaintiff's second

21

22          [1]  Plaintiff was given an opportunity to supplement his response but he failed to do so by the deadline
    established by the Court, April 6, 2015.  On April 9, 2015, the Court received a letter from plaintiff in which he
23  states that he "may have" found counsel and that counsel instructed him to request an additional 30 day extension.
    (Dkt. 45.)  The Court does not deem the additional extension warranted and therefore denies plaintiff's request.  The

REPORT AND RECOMMENDATION
PAGE - 1

amended complaint, defendants' motion for summary judgment, plaintiff's response, and the balance of the record, concludes that defendants' summary judgment motion should be granted, and that plaintiff's second amended complaint and this action should be dismissed with prejudice.

FACTUAL BACKGROUND

Plaintiff was booked into the RJC on August 11, 2011.  Plaintiff was medically screened as a part of the booking process and he reported at that time an extensive medical history including being legally blind in both eyes – having no vision in his right eye and only 3% vision in his left eye.  (Dkt. 34, Ex. 1.)  Plaintiff also reported that he had previously been diagnosed with schizophrenia and bipolar disorder.  (*Id.*)

On August 16, 2011, plaintiff was seen in triage by Registered Nurse ("RN") Rise Williams.  (*Id.*, Ex. 3.)  Plaintiff advised RN Rise that he had two sets of glasses, and that he wore both contact lenses and glasses in order to read.  (*Id.*, Ex. 3.)  Plaintiff indicated that a corrections officer had given him his contacts, but that he needed his other set of glasses and some contact lens solution.  (*Id.*)  The triage note indicates that plaintiff was scheduled for a follow-up medical appointment the following day to address a number of issues, including his vision issues.  (*Id.*)  The note also indicates that RN Williams issued a "green medical alert" to the corrections staff advising that plaintiff was legally blind and kept on his person two pairs of glasses and contact lenses in order to facilitate reading.  (Dkt. 34, Ex. 3.)

On Friday, August 19, 2011, plaintiff reported to RN William Johnston during a "deck call" that he had a contact lens in his left eye which was bothering him, but that he had no place

---

Court notes that well over 30 days have passed since plaintiff requested the extension and no counsel has yet appeared on his behalf.

REPORT AND RECOMMENDATION
PAGE - 2

to put the lens once he got it out.  (*Id*, Ex. 4.)  RN Johnston noted that plaintiff had a "slightly reddened sclera," assessed plaintiff's problem as eye irritation, and indicated that the corrections officer would get a contact holder and contact solution so that plaintiff could take the contact out. (*Id*.)

The following day, Saturday, August 20, 2011, plaintiff was seen in triage by RN Terry Emery for complaints about his eye and about having not received his psychiatric medications. (*Id*., Ex. 5.)  Plaintiff's complaint regarding his eye was recorded by RN Emery as follows:

> I think I permanently damaged my left eye.  I think it was a poorly manufactured contact that I put in it yesterday morning.  Now my eye is red, I can't open or close it, it hurts beyond belief.  I need to go to the hospital.  I have had this happen before in years gone past and I know what has happened.  I damaged the cornea – scratched it.  I took the contact out last night.  I wore it all day and because of that fact there could be permanent damage this time.  It usually goes away within a few hours but that isn't the case this time. . . .

(*Id*.)

RN Emery observed that plaintiff's left eye had a reddened sclera and a puffy upper eye lid, but that there were no "exudates" under the lids.  (*Id*.)  RN Emery noted that plaintiff complained of increased pain when the lids were moved, but that his left pupil was PERRLA[2], that he was able to blink repeatedly during the exam, and that his left eye was moist.  (*Id*.)  RN Emery assessed "eye pain" and contacted the on-call physician, Dr. Steven Lange, who ordered that plaintiff's eye be patched and that he be seen in the medical clinic the following Monday for evaluation of a possible corneal abrasion.  (Dkt. 34, Ex. 5.)  Plaintiff refused to wear the patch, stating that he was not "trained to function completely blind" and that he would try to keep his ye closed as much as possible.  (*Id*.)

---

[2] Defendants explain in their summary judgment motion that PERRLA is an abbreviation for "pupils equal, round, react to light, accommodation" and that the abbreviation is indicated in the record of the physical examination if all findings are normal.  (*See* Dkt. 33 at 3 n. 8.)

REPORT AND RECOMMENDATION
PAGE - 3

Plaintiff was seen in the medical clinic by Advanced Registered Nurse Practitioner ("ARNP") Nancy Ledgerwood on Monday, August 22, 2011, for evaluation of a possible corneal abrasion. (*Id*., Ex. 6 at 1.)  ARNP Ledgerwood noted that plaintiff was reporting new eye pain after having his contact out the preceding Friday night. (*Id*., Ex. 6 at 2.)  ARNP Ledgerwood observed that plaintiff was wearing glasses and was sitting there talking and blinking without apparent pain, but noted that plaintiff was reporting he couldn't see to read a book. (*Id*.)  On examination, ARNP Ledgerwood found that plaintiff had his contact back in so she applied saline drops to the left eye and plaintiff removed the contact. (*Id*.)  ARNP Ledgerwood next applied dye across plaintiff's cornea and noted no ulceration. (*Id*.)  ARNP Ledgerwood assessed eye pain and told plaintiff to leave his contact out. (*Id*.)  She also sent plaintiff to the Emergency Room ("ER") at Harborview Medical Center ("HMC"). (*See id*., Ex. 6 at 3 and Ex. 7.)

Plaintiff was seen in the ER later the same day by ARNP Cassandra Gavin.[3]  (*Id*., Ex. 7.) ARNP Gavin noted that plaintiff was being seen for left eye pain and that plaintiff had reported to her that he had suffered "4 days L. eye pain and erythema, blurry vision, yellow drainage and photophobia." (Dkt. 34, Ex. 7 at 1.)  ARNP Gavin also noted that plaintiff had "put in new contact 4 days ago and left it in for 24 hrs," that his pain had increased upon removal of the contact, and that he had put the contact back in his eye that afternoon and was unable to remove it. (*Id*, Ex. 7 at 1.)  ARNP Gavin noted as part of her summary of her physical examination of plaintiff, which included a report of psychiatric symptoms, that plaintiff was "[f]ixated on KCJ not adequately listening to his request for contact case." (*Id*., Ex. 7 at 2.)  ARNP Gavin

---

[3]  The Court notes that plaintiff was identified on the HMC records as "Michael Thomas Gutierrez" rather than "Michael Thomas Dodge," the identifier used in plaintiff's King County records. (*See* Dkt. 34, Exs. 7 and 8.) The Court further notes that plaintiff used the name "Michael Dodge Gutierrez" on the *in forma pauperis* application submitted to this Court. (*See* Dkt. 4.)  The Court is satisfied that Michael Gutierrez and Michael Dodge are the same individual.

REPORT AND RECOMMENDATION
PAGE - 4

transferred plaintiff to the HMC Ophthalmology Clinic for further assessment.  (*Id.*)

Plaintiff was seen in the Ophthalmology Clinic by Dr. Paramadeep Mand who diagnosed plaintiff with contact lens keratits in his left eye secondary to poor contact lens hygiene.  (*See id.*, Ex. 8 at 1.)  Dr. Mand also diagnosed "refractive error" in plaintiff's left eye due to aphakia; *i.e.*, the absence of a lens removed during cataract surgery.  (*Id.*, Ex. 8 at 2.)  Plaintiff's base ophthalmology exam indicated he had no light perception in his right eye and 20/400 visual acuity in his left eye.  (*Id.*)  Dr. Mand's treatment plan for plaintiff included Ofloxacin (eye drops) six times per day, a contact lens holiday, and a follow-up appointment in one week.  (*Id.*)

After being discharged from HMC, plaintiff was returned to the King County Correctional Facility in Seattle where he was seen by RN Lio Saephanh.  (*Id.*, Ex. 9.)  RN Saephanh reviewed the medication instructions with plaintiff and advised him that he would need to remain at the downtown jail facility for the next seven days while on the eye drops.  (*Id.*, Ex. 9 at 1.)  Plaintiff responded that he didn't need the drops six times per day and that he would refuse treatment if he could not go back to the RJC.  (*Id.*)  RN Saephanh's note of the encounter with plaintiff also indicates that while plaintiff was at HMC, he threatened to kill himself when told he could not wear his contact lens for two weeks, but then apparently immediately denied he would actually do so.  (Dkt. 34, Ex. 9 at 1.)  Plaintiff frequently refused the prescribed eye drops in the ensuing days.  (*See id.*, Ex. 10.)

On August 29, 2011, plaintiff returned to the HMC Ophthalmology Clinic for his follow-up appointment where he was seen by Dr. Naomi Odell.  (*See id.*, Ex. 11.)  Plaintiff reported at that time that though he refrained from wearing his contact for the first four days, he had been wearing it for the past two days because he was "totally blind without it."  (*Id.*, Ex. 11 at 1.)  Plaintiff reported that the eye felt much better.  (*Id.*)  He also acknowledged that he generally did

not remove his contacts for any reason, including sleep.  (*Id.*)

Dr. Odell noted that the keratitis in plaintiff's left eye "was greatly improved without epithelial defect."  (*Id.*, Ex. 11 at 2.)  Plaintiff's base ophthalmology exam indicated that his visual acuity in his left eye had returned to 20/200, the same as it had been prior to his incarceration.  (*See id.*, Ex. 11 at 2 and Ex. 12 at 3.)  Dr. Odell discontinued the eye drops but recommended continuing with the contact lens holiday when possible, particularly while sleeping.  (*Id.*)  Dr. Odell also noted that plaintiff would need a new contact as the one he had was damaged.  (*Id.*, Ex. 13.)

On October 12, 2011, plaintiff was seen in the medical clinic at the RJC by ARNP Glen Lirman.  (*Id.*, Ex. 14.)  Plaintiff had a list of complaints, though his primary complaint concerned a foot injury.  (*Id.*, Ex. 14 at 1.)  Plaintiff did, however, request another bottle of contact solution at that appointment.  (*Id.*, Ex. 14 at 2.)  Plaintiff explained that he needed additional solution due to having "double" contacts which required removal and re-washing multiple times each day. (*Id.*)  ARNP Lirman's notes from that appointment indicate that plaintiff had previously been given enough contact solution to "last months," and that he should have enough to last over a month even with excessive use.  (Dkt. 34, Ex. 14 at 2.)  No additional contact solution was apparently provided at that appointment.

Plaintiff was seen in triage on October 17, 2011 by RN Mike Zdravecky in response to multiple medical complaints.  (*Id.*, Ex. 15.)  Among plaintiff's complaints was that he was experiencing irritation in his left eye again, though he reported it was not as bad as before.  (*Id.*, Ex. 15 at 1.)  Plaintiff was advised not to wear any contact lenses if he was experiencing irritation because it could lead to severe complications.  (*Id.*, Ex. 15 at 2.)  Plaintiff acknowledged that he was aware of this risk but indicated that he needed to wear his contact

REPORT AND RECOMMENDATION
PAGE - 6

lens.  (*Id*.)  RN Zdravecky scheduled an appointment for plaintiff to be seen in the medical clinic for evaluation of his eye irritation and for consideration of plaintiff's request that he be prescribed more Ofloxacin.  (*Id*.)

Plaintiff was seen in the medical clinic by Dr. Lange on October 21, 2011 for multiple complaints.  (*See id*., Ex. 16.)  Plaintiff reported to Dr. Lange during that appointment that he used glasses as well as contacts in order to see and that he had lost a pair of glasses but was getting new ones made.  (*Id*.)  There is no indication that plaintiff complained of eye irritation at that time and Dr. Lange's physical examination apparently revealed no acute issues with respect to plaintiff's eyes.  (*See id*.)  No additional eye drops were prescribed.  (*See id*.)

On November 23, 2011, plaintiff was seen in his housing unit by RN Kathy Woodruff during a "med pass."  (*Id*., Ex. 17.)  Plaintiff reported various complaints to RN Woodruff, including a complaint of a headache.  (*Id*.)  RN Woodruff observed that plaintiff was wearing two pairs of glasses and he reported that he was wearing two pairs of contacts as well.  (*Id*.)

On December 24, 2011, plaintiff was seen in triage by RN Zdravecky in response to a complaint that he had received his new glasses but they were not strong enough.  (Dkt. 34, Ex. 18.)   Plaintiff requested that his eye clinic be contacted and asked to make a new prescription.  (*Id*.)  Plaintiff was observed during that encounter wearing two pairs of glasses at the same time.  (*Id*.)  An appointment was scheduled with a medical provider to address plaintiff's request for a prescription for stronger eye glasses.  (*Id*., Ex. 18 at 2.)

On January 23, 2012, plaintiff was seen in the RJC medical clinic for a follow-up appointment concerning his complaints of headaches which he attributed to poor vision and inadequate corrective glasses.  (*Id*., Ex. 19 at 2.)  Plaintiff advised ARNP Lirman at that appointment that he believed his vision had worsened since coming to jail and that the glasses he

REPORT AND RECOMMENDATION
PAGE - 7

received were therefore insufficient to compensate for his vision deficit.  (*Id*.)  Plaintiff further advised that he believed the damage he suffered to his left eye was attributable to keeping his contact in too long and not having a case for storage.  (*Id*.)  Plaintiff denied at that time having any pain in his eyes or experiencing any dizziness or photophobia.  (*Id*.)  ARNP Lirman indicated in his progress note that he would make a follow-up appointment for plaintiff with the HMC Ophthalmology Clinic.  (*Id*.)

Plaintiff was seen in the RJC medical clinic again on January 31, 2012 for various complaints including vision loss.  (*Id*., Ex. 20 at 1-2.)  The provider, ARNP Ledgerwood, noted that plaintiff's eye issue was not acute and that he had an appointment at HMC Ophthalmology scheduled for the following week.  (*Id*., Ex. 20 at 2.)

On February 6, 2012, plaintiff was seen at the HMC Ophthalmology Clinic by Dr. Deana Choi.  (*Id*., Ex. 21.)  Plaintiff reported violent headaches, extreme eye pain, and blurred vision at that time.  (Dkt. 34, Ex. 21.)  He further reported that he had been in and out of jail since 1992 and that he believed his vision was getting worse.  (*Id*., Ex. 21 at 2.)  Plaintiff also indicated that since he had "jail coverage" he would like new glasses.  (*Id*.)  Dr. Choi diagnosed plaintiff with left eye keratitis, resolved, and recommended that plaintiff continue the contact lens holiday as possible, especially when sleeping.  (*Id*.)  Dr. Choi also noted decreased vision in plaintiff's left eye, likely refractive in nature.  (*Id*.)  Dr. Choi recorded plaintiff's "baseline" left-eye vision as 20/200, but noted on examination visual acuity of 20/400 in plaintiff's left eye.  (*Id*.)  Dr. Choi also noted that plaintiff may need to have his right eye removed (enucleation) in the future.  (*Id*.)

On April 24, 2012, plaintiff was released from the custody of King County into the custody of the Washington Department of Corrections ("DOC").  (*Id*., Ex. 22.)  In July 2013, following his release from DOC custody, plaintiff was seen in the HMC ER for injuries suffered

REPORT AND RECOMMENDATION
PAGE - 8

in an alleged assault.  (*Id.*, Ex. 23.)  The notes of that visit indicate that plaintiff had recently been admitted to the Valley Medical Center, and hospitalized for 11 days, for a left corneal ulcer. (*Id.*)

Plaintiff was arrested on September 3, 2013 for attempted first degree robbery and was booked back into the King County Jail.  (*See* Dkt. 33 at 7 and Dkt. 34, Ex. 24.)  On February 14, 2014, while still in King County custody, plaintiff was taken to the HMC Ophthalmology Clinic, apparently for complaints concerning severe pain in his right eye and for follow-up of the contact lens associated keratits in his left eye.  (Dkt. 34, Ex. 25.)  Plaintiff's eye examination showed "no light perception" (NLP) in his right eye and visual acuity of 20/300 in his left eye.  Plaintiff was referred to UW Oculo-Plastics for evaluation of possible right eye removal (enucleation).  (Dkt. 34, Ex. 25 at 2.)

On May 1, 2014, a provider at the HMC Ophthalmology Clinic recommended enucleation of the right eye with an ocular implant, and the procedure was performed at HMC on May 29, 2014.  (*Id.*, Exs. 26 and 27.)  Plaintiff thereafter returned to DOC custody to serve a 96 month sentence imposed following his guilty plea in August 2014 to a charge of theft in the first degree.  (*See id.*, Ex. 2.)

Plaintiff filed the instant action in February 2014.  (*See* Dkt. 1.)  The Court declined to serve plaintiff's original and first amended complaints, but determined that plaintiff's second amended complaint was sufficient to warrant service.  (*See* Dkts. 6, 7, 8, 9, 10, 11 and 12.) Plaintiff identified four defendants in his second amended complaint, the King County Jail, Nurse Emery, Corrections Officer Harvey, and Nurse David.  (*See* Dkt. 10.)  The Court ordered service of the amended pleading on the King County Jail, Nurse Emery and Corrections Officer Harvey, but declined to order service on Nurse David because plaintiff failed to provide

REPORT AND RECOMMENDATION
PAGE - 9

sufficient identifying information to permit the Court to effectuate service.  (*See* Dkts. 11 and 12.)  Though the Court did not order service on Nurse David, counsel for defendants appears to have filed a waiver of service on behalf of the individual identified by plaintiff as Nurse David (*see* Dkt. 17) and, thus, the Court deems David Pasoquen, "Nurse David," a defendant in this action.

Plaintiff's claim, stated generally, is that employees at the RJC demonstrated deliberate indifference to his serious medical needs when they ignored his requests for a contact lens case and cleaning solution after he was booked into the RJC in 2011 thereby causing him to leave a torn contact lens in his eye which resulted in damage to the eye and deterioration of his vision. (Dkt. 10 at 2-7.)  Plaintiff's specific claims against the named defendants are as follows[4]:

With respect to Nurse David, plaintiff asserts that he spoke to Nurse David at a time when his "good eye" was red and swollen, and that Nurse David told him he could just take the contact lens out and throw it away, or ask the corrections officer to get him a lens case and solution.  (Dkt. 10 at 3.)  Plaintiff maintains that he was in "serious distress" and that Nurse David acted against policy in referring him back to the corrections officer when Nurse David knew the corrections officer was not going to supply plaintiff with a lens case and cleaning solution.  (*Id*. at 4.)

With respect to Nurse Emery, plaintiff asserts that after attempting over a period of time to obtain the items that would have permitted him to remove his torn contact lens, he contacted Nurse Emery during an evening "med pass" and asked to talk to him about how bad his eye was and his inability to obtain necessary supplies.  (*Id*. at 5.)  Plaintiff claims that Nurse Emery's

---

[4] Plaintiff appears to assert claims in his second amended complaint against individuals who are not named as defendants therein; *i.e.*, Officer Sellers and Jail Health Services Medical Director Dr. Ben Sanders.  The Court will not address plaintiff's apparent claims implicating non-defendants.

REPORT AND RECOMMENDATION
PAGE - 10

1   response to his request was that "nobody cared and it was a privilege to see in jail."  (*Id*.)

2   Plaintiff thereafter demanded that he be taken to the hospital.  (*Id*., at 5-6.)

3       Plaintiff asserts, with respect to Officer Harvey, that when he demanded to be taken to

4   the hospital because he knew how badly his eye was damaged, Officer Harvey merely laughed at

5   him.  (*Id*. at 6.)  Though not entirely clear, plaintiff appears to maintain that Officer Harvey then

6   refused to allow him to speak to a sergeant, told plaintiff that they would "mace" him if he

7   pressed the "help button" again, and told him to submit a kite and he would be seen the

8   following day. (Dkt. 10 at 6.)  Plaintiff acknowledges that he thereafter submitted a kite and was

9   seen the following day by a nurse who provided him a contact lens case and cleaning solution,

10  and had him sent to Harborview.  (*Id*. at 7.)

11      Plaintiff asserts that the nurse's assistance came too late as the damage to his eye was

12  already done.  (*Id*. at 7.)  Plaintiff further asserts that because of this "episode" his vision was

13  getting worse, and he cites to the fact that he was told when he was sent to Harborview in 2011

14  that his vision was 20/2400 and that he was told in May 2014 that his vision was 20/2800 and

15  that he may lose his vision completely.[5]  (*Id*. at 7.)

16  <u>DISCUSSION</u>

17      Summary judgment is appropriate when, viewing the evidence in the light most favorable

18  to the nonmoving party, there exists "no genuine dispute as to any material fact" such that "the

19  movant is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(a); *Anderson v.*

20  *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Material facts are facts which might affect the

21  outcome of the pending action under governing law.  *See Anderson*, 477 U.S. at 248.  Genuine

22  disputes are those for which the evidence is such that "a reasonable jury could return a verdict

23         [5] A review of plaintiff's relevant medical records suggests that the proper numbers are 20/400 and 20/800.

REPORT AND RECOMMENDATION
PAGE - 11

1   for the nonmoving party." *Id*.

2        In response to a properly supported summary judgment motion, the nonmoving party

3   may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts

4   demonstrating a genuine issue of fact for trial and produce evidence sufficient to establish the

5   existence of the elements essential to his case.  *See* Fed. R. Civ. P. 56(e).  A mere scintilla of

6   evidence is insufficient to create a factual dispute.  *See Anderson*, 477 U.S. at 252.  In ruling on a

7   motion for summary judgment, the court may not weigh the evidence or make credibility

8   determinations.  *Anderson*, 477 U.S. at 248.

9                                Section 1983 Standard

10        In order to set forth a *prima facie* case under § 1983, a plaintiff must establish a

11   deprivation of a federally protected right.  *Baker v. McCollan*, 443 U.S. 137, 140 (1979).  The

12   particular harm complained of must be scrutinized in light of specifically enumerated rights.  *Id*.

13   That a plaintiff may have suffered harm, even if due to another's negligent conduct, does not

14   itself demonstrate a violation of constitutional protections.  *See*, *e.g.*, *Davidson v. Cannon*, 474

15   U.S. 344, 347 (1986) ("[W]here a government official is merely negligent in causing the injury,

16   no procedure for compensation is constitutionally required.").

17        A plaintiff must also allege facts in his § 1983 complaint showing how individually

18   named defendants caused or personally participated in causing the harm alleged in the complaint.

19   *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981).  The causation requirement of § 1983 is

20   satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in

21   another's affirmative act, or omitted to perform an act which he was legally required to do that

22   caused the deprivation complained of.  *Arnold*, 637 F.2d at 1355 (quoting *Johnson v. Duffy*, 588

23   F.2d 740, 743-44 (9th Cir. 1978)).

REPORT AND RECOMMENDATION
PAGE - 12

A local government unit or municipality can be sued as a "person" under § 1983.  *Monell v. Department of Social Servs., of City of New York*, 436 U.S. 658, 691 (1978).  However, a municipality cannot be held liable under § 1983 solely because it employs a tortfeasor.  *Id*.  A plaintiff seeking to impose liability on a municipality under § 1983 must identify a municipal "policy" or "custom" that caused his or her injury.  *Bryan County Commissioners v. Brown*, 520 U.S. 397, 403 (1997), *citing Monell* 436 U.S. at 694.

In *Bryan County Commissioners*, the Supreme Court explained that

> it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Bryan County Commissioners*, 520 U.S. at 404.

King County Jail

Plaintiff identifies the King County Jail as a defendant in his second amended complaint.  Defendants argue in their summary judgment motion that the King County Jail cannot be held liable in this action because the Jail is not a distinct legal entity with the capacity to be sued.  The Washington Courts have, in fact, made clear that city or county departments are not legal entities subject to suit.  *See Nolan v. Snohomish County*, 59 Wn.App. 876, 883 (1990) ("in a legal action involving a county, the county itself is the only legal entity capable of suing and being sued.")  Accordingly, the King County Jail is not a proper defendant in this action.[6]

---

[6] Even assuming plaintiff had identified King County, rather than the King County Jail, as a defendant in this action, plaintiff fails to identify any policy, custom or practice of the County that cause him harm of federal constitutional dimension.  The claims asserted by plaintiff in his second amended complaint pertain to the alleged misconduct of individual employees of the King County Regional Justice Center jail facility.  As noted above, a municipality may not be held liable under § 1983 solely because it employs a tortfeasor.

REPORT AND RECOMMENDATION
PAGE - 13

<u>Inadequate Medical Care</u>

Plaintiff alleges that defendants violated his Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment right to due process when they exhibited deliberate indifference to his serious medical needs.  It appears that plaintiff was a pretrial detainee at the RJC at times relevant to his complaint and, thus, his claim of inadequate medical care arises under the Due Process Clause of the Fourteenth Amendment.  *Carnell v. Grimm*, 74 F.3d 977, 979 (9th Cir. 1996).  The claim is nonetheless properly analyzed under Eighth Amendment standards. *See id*.

In order to establish an Eighth Amendment violation, a prisoner must satisfy a two-part test containing both an objective and a subjective component.  The Eighth Amendment standard requires proof that (1) the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation; and (2) the prison official acted with a sufficiently culpable state of mind.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

The objective component of an Eighth Amendment claim is "contextual and responsive to 'contemporary standards of decency.'"  *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  The state of mind requirement under the subjective component of the Eighth Amendment standard has been defined as "deliberate indifference" to an inmate's health or safety.  *Farmer*, 511 U.S. at 834.  Under the "deliberate indifference" standard, a prison official cannot be found liable for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety.  *Farmer*, 511 U.S. at 837.

The Ninth Circuit has explained that "[p]rison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical

REPORT AND RECOMMENDATION
PAGE - 14

treatment." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal quotation marks omitted).  "[A] serious medical need is present whenever the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002).

Plaintiff fails to make clear in his second amended complaint precisely when the events which give rise to the constitutional claims asserted in this action occurred.  However, comparing plaintiff's narrative description of his claim to the medical records provided by defendants in support of their summary judgment motion suggests that the relevant time period is August 19-22, 2011.

Plaintiff asserts in his second amended complaint that during this time period RJC employees, including the three individual defendants named in this action, refused to provide him a contact lens case and contact lens solution, and he suggests that this refusal to act caused permanent damage to his eye.  (Dkt. 10 at 2-7.)  However, plaintiff also makes clear in his pleading that the contact lens at issue was torn during the entirety of the period in question.  (*See id*. at 5.)  Plaintiff's apparent refusal to remove a damaged contact lens, regardless of the availability of a case or cleaning solution, certainly undermines any claim of deliberate indifference on the part of defendants.  The record makes clear that plaintiff had glasses available to him and, thus, had an alternative to wearing the damaged contact.  The Court also notes that plaintiff at no point complains that he was denied a new and undamaged contact, only that he was denied a means to store and clean a damaged contact.  This Court is not convinced, based on plaintiff's own assertion and the evidence in the record, that plaintiff was denied any necessary supplies or, in any event, that the lack of such supplies was the cause of any harm he claims to have suffered.

REPORT AND RECOMMENDATION
PAGE - 15

Even assuming the alleged lack of a contact case and cleaning solution contributed to the keratitis diagnosed by the HMC Ophthalmology Clinic on August 22, 2011, plaintiff provides no evidence that any of the named defendants refused to provide necessary supplies.  There is no reference at all to Nurse David in plaintiff's King County medical records and plaintiff's description of Nurse David's alleged misconduct is consistent in terms of both timing and content with an interaction plaintiff had with RN William Johnston on August 19, 2011.  (*See* Dkt. 10 at 3-4 and Dkt. 34, Ex. 4.)  Given the complete absence of any evidence that Nurse David was involved in the interaction plaintiff complains of, any claims against Nurse David must be dismissed.

As to Officer Harvey, plaintiff's primary claim is that he laughed at plaintiff when plaintiff demanded to be taken to the hospital and, construing plaintiff's second amended complaint liberally, that he caused some delay in plaintiff receiving treatment for his red and swollen eye when he instructed plaintiff to submit a kite.  (*Id*. at 6.)  However, even plaintiff concedes that after submitting the kite as instructed by Officer Harvey, he was seen by a medical provider the following day, as Officer Harvey advised him he would be, and he was thereafter taken to HMC for further assessment and treatment.  (*Id*. at 7.)  Plaintiff offer no evidence that this slight delay in receiving treatment resulted in any further significant injury or the unnecessary or wanton infliction of pain.   Plaintiff has therefore not established any constitutional violation on the part of Officer Harvey.

As to Nurse Emery, plaintiff suggests that Nurse Emery was dismissive of his concerns regarding his red and painful left eye and failed to provide any treatment whatsoever.  However, the evidence in the record demonstrates that Nurse Emery saw plaintiff in triage on August 20, 2011 and examined his eye.  (Dkt. 34, Ex. 5.)  RN Emery observed that plaintiff's left eye had a

REPORT AND RECOMMENDATION
PAGE - 16

reddened sclera, that his upper eye lid was puffy, and that he reported increased pain when his eyelid was moved. (*Id.*) RN Emery contacted the on-call provider, Dr. Lange, who ordered that the eye be patched and that plaintiff be seen in the RJC medical clinic the following Monday. (*Id.*)

While it appears from RN Emery's notes of this appointment that plaintiff felt he needed to go to the hospital for treatment of what he believed to be a scratched cornea, nothing in the record suggests that plaintiff's condition warranted expedited treatment at a hospital. And, while plaintiff was sent to HMC two days later for further assessment and treatment of his red and painful left eye, nothing in the record suggests that this delay in receiving specialized evaluation and treatment resulted in any further significant injury or the unnecessary or wanton infliction of pain.

In fact, though plaintiff contends that the RJC staff's failure to properly respond to his request for contact lens supplies and for treatment of his eye, the evidence in the record suggests the contrary. Plaintiff indicates in his second amended complaint that his visual acuity in his left eye was 20/200 prior to experiencing the problems complained of in this action.[7] When he was seen in the HMC Ophthalmology Clinic on August 22, 2011, the visual acuity in plaintiff's left eye was tested at 20/400. (*See id.*, Ex. 8.) At a follow-up appointment at the HMC Ophthalmology Clinic a week later, August 29, 2011, plaintiff reported he was experiencing no pain or redness, and visual acuity in plaintiff's left eye tested at 20/200. (*Id.*, Ex. 11.) While subsequent eye examinations at the HMC Ophthalmology Clinic revealed a worsening of plaintiff's vision in the previously affected eye, nothing in the record suggests that the decreased

---

[7] Plaintiff actually reports his vision as 20/2200, but it appears clear from a review of other numbers in his second amended complaint and in his medical records that 20/200 is the correct number.

REPORT AND RECOMMENDATION
PAGE - 17

vision was attributable to the previously resolved keratitis.

Defendants, in their summary judgment papers, have demonstrated that plaintiff received timely and appropriate treatment for eye-related concerns which arose during the course of his confinement in 2011.  Plaintiff has offered no evidence to rebut that submitted by defendants. As plaintiff has established no violation of his federal constitutional rights, defendants are entitled to summary judgment in this action.

<u>CONCLUSION</u>

Based on the foregoing, this Court recommends that defendants' motion for summary judgment be granted, and that plaintiff's second amended complaint and this action be dismissed with prejudice.

<u>DEADLINE FOR OBJECTIONS</u>

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14) days** after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **<u>July 3, 2015</u>**.

DATED this <u>4th</u> day of June, 2015.

_____
Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 18